## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BURGESS ROE and JANE J. ROE, | : | Case No. 4:11-cv-00816 |
|     Plaintiffs | : | |
| | : | (Judge Brann) |
|     v. | : | |
| | : | |
| CHIEF EXPLORATION & | : | |
| DEVELOPMENT LLC, et al. | : | |
|     Defendants. | : | |

**************************************************************

| | | |
|---|---|---|
| MICHAEL BEINLICH and LORI | : | Case No. 4:11-cv-00697 |
| BEINLICH, | : | |
|     Plaintiffs | : | (Judge Brann) |
| | : | |
|     v. | : | |
| | : | |
| CHIEF EXPLORATION & | : | |
| DEVELOPMENT LLC, et al. | : | |
|     Defendants. | : | |

**************************************************************

| | | |
|---|---|---|
| DAVID C. BEINLICH and KAREN | : | Case No. 4:11-cv-00579 |
| F. BEINLICH, | : | |
|     Plaintiffs | : | (Judge Brann) |
| | : | |
|     v. | : | |
| | : | |
| CHIEF EXPLORATION & | : | |
| DEVELOPMENT LLC, et al. | : | |
|     Defendants. | : | |

## MEMORANDUM

August 13, 2013

For the reasons that follow, the motion of Chief Exploration &

Development, et al. (hereinafter, "Chief")[1] for summary judgment[2] is granted in part, and denied in part, in accordance with the accompanying Order of this date.

## I. Background

In 2005, the plaintiffs, property owners in Sullivan County, Pennsylvania, became lessors pursuant to oil-and-gas leases with counterparty-lessee Chief. (Def.'s Facts, May 4, 2012 ¶¶ 1-4). The Roe plaintiffs's lease with Chief commenced October 28, 2005; both of the Beinlich plaintiffs's leases commenced days earlier on October 25, 2005. (Id. ¶¶ 2-4). The leases provide Chief exclusive rights to "all the oil, gas, and coalbed methane and their constituents . . . underlying the [land leased by the plaintiffs], together with such exclusive rights as may be necessary or convenient for [Chief] . . . to explore for, develop, produce, measure, and market production from [the land leased by plaintiffs]."

This many years later, the parties dispute whether Chief's rights under the

---

[1] In addition to Chief Exploration & Development LLC, a number of entities and individuals possess an interest in the gas leases at issue. These entities are aligned with Chief Exploration & Development LLC as defendants in this litigation.

[2] On April 23, 2011, the Honorable Robert D. Mariani (who was then presiding over this matter) granted Chief's motion to file a single motion for summary judgment that would apply against all plaintiffs in the above-captioned matters. The decision to grant the motion was "premised on the representations of counsel that the terms of the leases in the above captioned matters are identical except for the dates of commencement." (Ct. Order, Apr. 23, 2011).

leases have expired or still remain in force. As one might expect, the focus of the parties is on the "lease term" clause (also known as a "habendum" clause) common to the leases, which provides in relevant part:

> This Lease shall remain in force for a primary term of five (5) years from [commencement], and for as long thereafter as prescribed payments are made, or for as long thereafter as operations are conducted on the Leasehold in search of production of oil, gas, or their constituents, or for as long as a well capable of production is located on the Leasehold, or for as long as extended by other provisions herein, or for as long as the Leasehold is used for the underground storage of gas of or for the protection of stored gas.

According to plaintiffs, each lease expired at the end of its respective five-year "primary term," which, following the respective interpretations of the plaintiffs, came at midnight on October 24, 2010 for Michael and Lori Beinlich (M. & L. Beinlich Opp'n Br. at 4), on October 25, 2010 for David and Karen Beinlich (D. & K. Beinlich Opp'n Br. at 7), and at midnight on October 27, 2010 for the Roe plaintiffs (Roe Facts ¶ 46). Chief, on the other hand, asserts that it extended each of the leases by duly commencing "operations . . . on the Leasehold in search of production of oil, gas, or their constituents" prior to the expiration of the respective primary terms.

None of Chief's alleged "operations" actually occurred "on the Leasehold[s]" of the plaintiffs, but this is no impediment when the term clause is read in conjunction with the "Unitization" clause common to the leases, which provides in relevant part:

Lessor grants Lessee the right to pool, unitize, or combine all or part of the Leasehold with other lands, whether contiguous or not contiguous, leased, or un-leased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Lessee is granted the right to change the size, shape and conditions of operations or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise . . . the drilling, operations in preparation for drilling, production from, or payment for Royalty, Shut-in Royalty, or Delay in Marketing for a well on such a unit shall have the same effect upon the terms of this Lease as if the well were located on the Leasehold.

That is to say, Chief could extend the leases by virtue of timely "operations . . . in search of production of oil, gas, or their constituents" on other parts of a unit in which plaintiffs's leaseholds were included.

By way of a pooling and unitization agreement, Chief made plaintiffs's properties part of the so-called "Castrogiovanni Unit" either on September 29, 2010 or October 12, 2010 – the date is disputed, so the Court assumes the latter date – but in any case prior to the expiration of the respective primary terms of the leases. (See Def.'s Facts ¶ 7; Roe's Facts ¶ 7; M. & L. Beinlich's Facts ¶ 7). All agree that Chief recorded the declaration of pooling and unitization agreement on October 21, 2010 with the Sullivan County Recorder of Deeds. (Id. ¶ 31).

Chief contends that its activities on the Castrogiovanni family's property (property that is, as one would expect, also a part of the Castrogiovanni Unit) prior

to the expiration of the respective primary terms of plaintiffs's leases, combined with the prompt completion of an oil and gas well on that property in March 2011 (Def.'s Facts ¶ 42), constituted "operations . . . in search of production of oil, gas, or their constituents" sufficient to extend plaintiffs's leases beyond their respective primary terms. Plaintiffs disagree.

As for Chief's activities with respect to the Castrogiovanni property, the parties agree that, in the seven months prior to the expiration of the respective primary terms of the leases, Chief established the location of a well on the Castrogiovanni property; conducted field surveys; staked the well location; confirmed there were no wetlands on the property; obtained a vertical drilling permit from the Pennsylvania Department of Environmental Protection ("DEP") and prepared an amended application for a horizontal drilling permit; obtained a permit from the Susquehanna River Basin Commission for the withdrawal of water for use in constructing a well; obtained an Erosion and Sediment Control General Permit from the DEP; conducted necessary environmental reviews; and finalized several necessary regulatory submissions. (Def.'s Facts ¶¶ 10-29). All of this occurred prior to the October 12, 2010 execution of the pooling an unitization agreement that made plaintiffs's properties part of the Castrogiovanni Unit. Subsequently, Chief's performance bond for construction of the Castrogiovanni

well became effective (October 14, 2010) (Id. ¶ 30), and on October 21, 2010, Chief recorded the declaration of pooling and unitization agreement. (Id. ¶ 31).

Plaintiffs admit that, on October 23 or 24, 2010, surveyors staked the Castrogiovanni property and Chief's contractor delivered a bulldozer there. (Id. ¶¶ 32-38). Plaintiffs also admit that, on October 27, 2010, a contractor cut down 3-5 trees on the Castrogiovanni property (id. ¶ 39), and, on October 28, 2010, crews began clearing lumber (id. at 40). Plaintiffs otherwise dispute Chief's claim to have been working on the property between October 23 and October 28, 2010. (Roe's Facts ¶ 42; M. & L. Beinlich's Facts ¶ 42; D. & K. Beinlich's Facts ¶ 42). They do not dispute that beginning on October 28, 2010, Chief worked continuously (allowing breaks for weekends, holidays, etc.) to ultimately complete a well on the Castrogiovanni property in March of 2011. (Def.'s Facts ¶ 42).

In March and April of 2011, plaintiffs filed suit in the Court of Common Pleas of Sullivan County, Pennsylvania, asserting that their leases with Chief expired at the end of the respective primary terms, and seeking remedies pursuant to causes of action for quiet title, ejectment, trespass, loss of gas lease income, cancellation of declaration, anticipatory trespass, breach of implied duties of good faith and fair dealing, bad faith unitization, and declaratory judgment. Asserting diversity jurisdiction, Chief removed the cases to federal court in March and April

of 2011. On May 4, 2012, Chief filed for summary judgment.

## II.     Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" where it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" where "the evidence is such that a reasonable jury," giving credence to the evidence favoring the nonmovant and making all reasonable inferences in the nonmovant's favor, "could return a verdict for the nonmoving party." Id.

For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed must" be supported by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Thus, where the moving party's motion is properly supported and his

evidence, if not controverted, would entitle him to judgment as a matter of law, the nonmoving party, to avoid summary judgment in his opponent's favor, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. In the face of the moving party's evidence, the nonmoving party's mere allegations, general denials or vague statements will not create a genuine factual dispute. See Bixler v. Cent. Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1302 (3d Cir. 1993). Only citation to specific facts is sufficient. Anderson, 477 U.S. at 250.

Where the nonmoving party has had adequate time for discovery and will bear the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and summary judgment is warranted. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## III. Discussion

Chief argues that the largely undisputed facts set forth above compel the conclusion that its leases with plaintiffs did not expire at the end of their respective primary terms. In support of its position, Chief asserts that the language of the "lease term" clause must be interpreted to allow Chief to extend each lease by

commencing "operations" prior to the expiration of the primary term. Furthermore, Chief argues that Pennsylvania caselaw, respected treatises, and caselaw from other jurisdictions establish a rule that, "[t]o perpetuate a lease by commencement of 'operations,' a lessee . . . simply needs to begin steps necessary to the drilling process and have the <u>bona fide</u> intention to continue work until a well is completed on the site." (Def.'s Br. at 20). According to Chief, evidence of its "significant activity both 'behind-the-scenes' and on the Castrogiovani Property" prior to the expiration of the respective primary terms of plaintiffs's leases (<u>id.</u> at 26), combined with evidence that Chief undertook this activity with the <u>bona fide</u> intention of drilling a well[3] (<u>id.</u> at 27), establishes beyond peradventure that Chief timely commenced "operations" sufficient to extend the leases. Moreover, Chief takes the position that, even if its "behind-the-scenes" activity is not considered, its "activity physically conducted on the Castrogiovanni Property was sufficient to constitute commencement of operations when coupled with Chief's undeniably <u>bona fide</u> intention to continue work until there was a completed well." (<u>Id.</u> at 26 n.19).

---

[3]In this regard Chief points to its continuous work on the well completed in March, 2011, as well as its investment in "engaging contractors, obtaining permits and bonds, creating a drilling unit, <u>et cetera</u>," prior to the expiration of the respective primary terms of plaintiffs's leases. (<u>Id.</u> at 27).

Plaintiffs respond that the meaning of the key phrase in the leases –
"operations . . . in search of production of oil, gas, or their constituents" – is
ambiguous and could condition Chief's extension of the leases on anything
spanning from the interpretation Chief offers to the actual drilling of a well during
the primary terms of the leases.  Plaintiffs argue that consideration of parol
evidence is necessary to discover the parties's intentions. Further, say plaintiffs,
Chief's interpretation of the relevant caselaw is erroneous and does not support the
supposed rule propounded by Chief with respect to the quantum of activity
sufficient to constitute "operations." Assuming the Court will reject Chief's
position and hold instead that a greater quantum of activity is required to constitute
"operations . . . in search of production of oil, gas, or their constituents,"  the
plaintiffs argue that the Court should consider only Chief's post-unitization
physical activity on the Castrogiovanni property when determining whether
Chief's activity sufficed for lease extension. But even if Chief's rule is accepted by
the Court, plaintiffs continue, whether Chief possessed the <u>bona fide</u> intention to
drill prior to the expiration of the respective primary terms of the leases is a jury
question improperly resolved on summary judgment.

Additionally, Michael and Lori Beinlich argue that there is a genuine issue
of material fact respecting whether Chief acted improperly and in bad faith when it

included their property in the Castrogiovanni Unit.

**(a.)  Contract Interpretation**

The parties's central disagreement concerns the meaning of the "lease term" clause, which provides, in relevant part: "This Lease shall remain in force for a primary term of [five] years . . . and . . . for as long thereafter as  operations are conducted on the Leasehold in search of production of oil, gas, or their constituents."

Under Pennsylvania law, which applies in this diversity action,[4] "a lease is in the nature of a contract and is controlled by principles of contract law." T.W. Phillips Gas and Oil Co. v. Jedlicka, 615 Pa. 1999, 42 A.3d 261, 267 (2012). The party seeking to terminate the lease bears the burden of proof. Id.

Contract interpretation is an "attempt to ascertain the intent of the parties and give it effect," and "[w]hen the words of an agreement are clear and unambiguous, the intent of the parties is to be ascertained from the language used

_____

[4]"In the absence of a controlling decision by the Pennsylvania Supreme Court, a federal court applying that state's substantive law must predict how Pennsylvania's highest court would decide" an issue. Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, 45-46 (3d Cir. 2009). "In predicting how the highest court of the state would resolve the issue, [the Court] must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." Id. at 46 (internal quotation marks omitted).

in the agreement." <u>LJL Transp., Inc. v. Pilot Air Freight Corp.</u>, 599 Pa. 546, 962 A.2d 639, 647 (2009). Where the words are ambiguous, on the other hand, "parol evidence is admissible to explain or clarify or resolve the ambiguity." <u>Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.</u>, 588 Pa. 470, 905 A.2d 462, 469 (2006).

When determining whether the language of an agreement is clear or ambiguous, the Court assumes that the parties intend "all provisions in the agreement [to] be construed together and . . . given effect." <u>Id.</u> The "focus . . . is upon the terms of the agreement as <u>manifestly expressed</u>, rather than as, perhaps, silently intended." <u>Steuart v. McChesney</u>, 498 Pa. 45, 444 A.2d 659, 661 (1982) (emphasis in original). Thus, the Court assumes generally that the parties have given words their "commonly accepted and plain meaning," <u>id.</u>, but also recognizes "that every agreement is made and to be construed with due regard to the known characteristics of the business to which it relates . . . and hence the language used in a contract will be construed according to its purport in the particular business, although this results in an entirely different conclusion from what would have been reached had the usual meaning been ascribed to those words." <u>Franklin Sugar Ref. Co. v. Howell</u>, 274 Pa. 190, 118 A. 109, 110 (1922).

Interpretation is not concerned with parties's "post hoc judgment[s] . . . as to

what should have been," and the Court will not "rely upon a strained contrivancy" to establish ambiguity. <u>Steuart</u>, 444 A.2d at 663. The Court, rather, seeks to be faithful to the meaning that the parties – given their positions at the time of contracting – would have given their words <u>ex ante</u>.

To determine whether the clause at issue in this case is clear or ambiguous, a little history and context is helpful. Since the beginning of the oil and gas industry in the United States, the habendum clause – that is, the clause in each oil and gas lease that sets forth the duration of the lessee's interest – has in fits and starts evolved to better meet the needs of lessors and lessees. Fixed term leases were abandoned in favor of leases that continued for as long as the premises remained productive:

> This was accomplished by attaching to the habendum clause of the long definite term lease a provision that the lease should continue thereafter as long as oil or gas were produced from the demised land in paying quantities. Such leases first made their appearance in the early 1880's . . .. This provision, commonly spoken of as the "thereafter" or "paying quantities" clause, was destined to become the dominant principle of the modern habendum clause.

Nancy Saint-Paul, <u>Summers Oil and Gas</u> § 14:19 (3d ed.). Nevertheless, this change alone did not "prove altogether satisfactory," <u>id.</u>, so parties made additional alterations:

> The earlier leases usually contained a covenant by the lessee to drill a well or wells within a certain limited time, and to continue the

development of the land to "success or abandonment." If the lessee failed to perform this covenant, the lessee might forfeit the lease. . . . [T]his type of drilling clause was not suitable for the oil and gas industry. The change demanded was relief of the lessee from the necessity of immediate drilling on pain of forfeiture. This was accomplished by the introduction of a new type of drilling clause, which came to be known as the "drill or pay" clause. By its terms the lessee covenanted to drill or commence drilling within a specified time, ranging from a few months to five years, or thereafter pay a stipulated sum of money periodically until the land was proven productive or barren of oil or gas.

Id. Still further tailoring followed:

To escape from the burden of paying rent after it had become apparent that the land was unprofitable for oil and gas, the lessees made two changes in the drilling clause. One of these changes was accomplished by adding to the "drill or pay" clause a "surrender" clause, giving the lessee power to surrender the lease at his option at any time the premises proved unprofitable for oil and gas purposes. The same result was accomplished by the use of the "unless" drilling clause. By this clause the lessee . . . could drill within the limited time given for exploration, but, if he did not drill within that time the lease terminated, unless he kept it alive by the payment of rent. There was no obligation to pay rent.

Id. at § 14:20.

When a lease contained both a "thereafter" or "paying quantities" clause and a "drill or pay" or "unless" clause, courts generally gave both clauses effect by holding that the former clause conditioned extension of the lease term upon the lessee's completion of a well that produced in paying quantities[5] prior to the

_____

[5]"Production in paying quantities" means, "[f]or purposes of the habendum clause, . . . production in quantities sufficient to yield a return in excess of operating costs, even though drilling and equipment costs may never be repaid and

14

expiration of the lease's primary term, while the latter clause allowed the lessee (having paid rentals for the privilege) to "commenc[e] operations" at any time during the primary term. See W. Pennsylvania Gas Co. v. George, 161 Pa. 47, 52-53 (1894). Because the lessee's "late start or miscalculation of difficulties or time d[id] not excuse [his] failure to produce" within the primary term, J.J. Fagan & Co. v. Burns, 226 N.W. 653, 655 (1929), however, such a lease allocated a number of undesirable risks to the lessee.

Predictably, there evolved "[t]he habendum . . . clause of the usual modern lease," which combines elements of the older clauses to "enable[] a lessee to extend [a lease] beyond the primary term without actual production." Summers Oil and Gas § 14:23. Such a clause largely relieves the lessee of "late start and miscalculation" risks by replacing the requirement of actual production during the lease's primary term with the requirement that the lessee merely commence "operations" or "drilling operations" before the primary term's expiration and proceed to the completion of a well with due diligence. Id. § 15:19 ("In the absence of [an] express statement requiring due diligence in completion of the well such duty [is] implied"). This modern "'commence' clause . . . represents a concession

the undertaking considered as a whole may ultimately result in a loss." Howard R. Williams & Charles J. Meyers, Manual of Oil and Gas Terms § 8-P (15th ed.)

by the landowner to the lessee since thereunder it is not necessary for the lessee to depend upon the uncertainty of production to hold the lease." Leslie Moses, <u>Bench and Bar: What Constitutes Commencement of Operations Under an Oil, Gas, and Mineral Lease</u>, 16 Tul. L. Rev. 573, 577 (1942). The Court adds that, presumably, this "concession" to the lessee comes at a price built into the lease for the lessor's benefit – parties at arms-length generally bargain over such concessions, either explicitly or implicitly (as form leases incorporate terms bargained over explicitly by previous lessors and lessees).

While it is common for commence clauses to condition lease extension explicitly on the "commencement" of "operations," failure to use the word "commencement" or "commence" does not render such a clause ambiguous – reference to "operations" standing alone is generally sufficient to make the meaning of the clause distinct. <u>See, e.g., Cason v. Chesapeake Operating, Inc.</u>, 92 So.3d 436, 438 (La. Ct. App. 2012) (lease continuing for "as long as the lessee is 'engaged in operations for drilling'" interpreted as commencement lease); <u>Johnson v. Yates Petroleum Corp.</u>, 981 P.2d 288, 289-90 (N.M. Ct. App. 1999) (lease remaining in force so long as lessee was "engaged in drilling . . . operations"

interpreted as commencement lease).[6] At least where a "form lease" is concerned,[7] the "lease should be read . . . in connection with the purpose of its clauses" as developed in the industry. J.J. Fagan, 226 N.W. at 654. In the context of a form habendum clause "reflecting the development and present status of the law of oil and gas" as outlined above, id., reference to "operations" denotes a commence clause unambiguously in the absence of other lease language that compellingly indicates an alternative meaning.

Thus, the lease language at issue in this case – "[t]he Lease shall remain in force for a primary term . . . and . . . for as long thereafter as  operations are conducted on the Leasehold in search of production of oil, gas, or their constituents" – which is found in a form lease, suggests that the parties agreed to a commence clause. The lessors point to nothing in the remainder of the lease that puts this in doubt.[8]

_____

[6]As a matter of ordinary usage, a lessee need only "commence" operations and continue them diligently to be "engaged" in or (in the language of the Beinlich and Roe leases) "conduct[ing]" operations.

[7]As opposed to "an isolated or private agreement, drafted by uninformed neighbors to roughly express their understanding." J.J. Fagan, 226 N.W. at 654.

[8]The lessors make no persuasive argument for the notion that the appendage, "in search of production," helps their cause and the Court sees none. (See D. & K. Beinlich Opp'n Br. at 8-9, 11). There is no meaningful difference between "operations . . . in search of production" and "drilling operations," the latter term being defined, consistent with the discussion that follows, as "[a]ny work or actual

This leaves the issue of whether Chief commenced "operations" before the expiration of the primary term of each lease and proceeded to the completion of a well with due diligence. "Operations" is "not a term of art with a clearly understood definition." Howard R. Williams & Charles J. Meyers, <u>Manual of Oil and Gas Terms</u> § 8-O (15th ed.). Agreements in which the term is found often supply a particularized definition "refer[ring] to activity leading to the production of oil and gas." <u>Id.</u> But where, as in this case, an agreement has supplied no definition of "operations," many courts before this one have asked and considered what it takes to "commence operations," and have overwhelmingly answered: precious little.

Collecting cases from oil and gas producing states in 1942, one commentator concluded that "great leeway is given [to the lessee], where later events show good faith. One thing is certain – the courts are definite in their holding that the clause does not mean actual drilling of the well by the penetration of drill or bit into the

_____

operations undertaken or commenced in good faith for the purpose of carrying out any of the rights, privileges or duties of the lessee under a lease, followed diligently and in due course by the construction of a derrick and other necessary structures for the drilling of an oil or gas well, and by the actual operation of drilling in the ground." <u>Manual of Oil and Gas Terms</u> § 8-D (citing cases). "Drilling" is simply the "[a]ct of boring a hole through which oil and/or gas may be produced if encountered in commercial quantities," <u>id.</u>, which is to say, the "search for production."

ground." Moses, <u>supra</u>, at 584. Not much has changed since. Today, one authority collecting cases summarizes:

> The general rule is that actual drilling is unnecessary, but the location of well sites, hauling lumber on the premises, erection of derricks, providing a water supply, moving machinery on the premises and similar acts preliminary to the beginning of the process of drilling, when performed with the bona fide intention to proceed with diligence toward the completion of the well, constitute a commencement or beginning of a well or drilling operations within the meaning of the lease.

<u>Summers Oil and Gas</u> § 15:19. Another offers:

> Although there is some limited authority to the contrary, in general it appears that the courts have been ready to find the commencement of operations (or the pursuit of drilling operations) where only the most modest preparations for drilling have been made. . . .

> In brief, drilling operations may be described as any work or actual operations undertaken or commenced in good faith for the purpose of carrying out any of the rights, privileges or duties of the lessee under a lease, followed diligently and in due course by the construction of a derrick and other necessary structures for the drilling of an oil and gas well, and by the actual operation of drilling in the ground.

Patrick H. Martin & Bruce M. Kramer, <u>Williams & Meyers, Oil and Gas Law</u> § 618.1 (2012).

Giving the lessee "great leeway" in manifesting his intent to drill is eminently sensible in light of the interests of the parties. From the perspective of the lessee acting in good faith, the quantum and onerousness of necessary "operations" should be minimal. If the hurdle is too high, the lessee risks sinking

investment into preparations for drilling as the lease's primary term counts down, only to fall short of the mark and lose the lease. On the other side, the lessor – ex ante, of course – should be relatively indifferent to what the lessee does by way of preparations for drilling prior to expiration of the lease's primary term. This is so for the simple reason that the ordinary lessor has no way of predicting how those preparations will ultimately relate to whether or when a well will be completed.[9] Much more important to the ordinary lessor should be the diligence of the lessee in continuing operations, as the courts and authorities have recognized.[10] Lessors with

_____

[9]Of course, a lessee's extensive preparations provide some evidence of the likelihood that the lessee will ultimately choose to complete a well. To the extent such information is especially valuable to the lessor, he is free to bargain for it.

[10]"The matter [of commencement of operations] cannot be permitted to rest [with the lessee's preparations prior to the expiration of the primary term], however. Even the spudding in of a well should not suffice to hold the lease in effect for a year . . . where the lessee manifests the absence of an intent to complete the drilling of the well. Upon an adequate manifestation that the lessee does not intend to complete the well, the lease should be held to terminate automatically. The theory of termination in this instance is that although for a time it appeared that a well had been commenced, there had in fact been no 'commencement' of a well. The seeming 'commencement' was a mere sham because the lessee did not intend to complete the well." Williams & Meyers, Oil and Gas Law § 606.1 (discussing construction of "unless" clause).

"In most instances where the courts have held that . . . preliminary work is not sufficient compliance with the obligation to keep the lease in force, either good faith has been lacking, or later acts show the absence of an intent to continue work with due diligence." Moses, supra, at 580.

idiosyncratic preferences, of course, are free depart from the norm by writing their leases accordingly.

The Supreme Court of Pennsylvania's 1898 decision <u>Henderson v. Ferrell</u>, 183 Pa. 547, 38 A. 1018 (1898), is consistent with the view that very little should be required of the lessee to satisfy the commencement obligation prior to the expiration of the primary term, so long as he intends to proceed with due diligence. In <u>Henderson</u>, the lease provided that "the lessee was required to commence operations on the premises within 30 days from the date thereof"; upon "his failure to do so, the lease was to be considered by the parties as 'null and void.'" <u>Henderson</u>, 38 A. at 1018. The lessee, Henderson, entered upon the leasehold on the last day of the primary term. He "drove a stake near the center of the lot, to indicate the location of the proposed well, and the point at which the lumber required in the performance of the work called for by the lease should be deposited." <u>Id.</u> When Henderson's man came to unload the lumber, the lessor and a "number of persons" insisted that Henderson's man had no right (on the ground that the "time allowed for the commencement of operations [had] expired [at noon] that day") and prevented him from making his deposit. <u>Id.</u> In an action for ejectment, the Supreme Court of Pennsylvania affirmed judgment for Henderson upon a jury verdict finding the "lessees entered and commenced operations upon

the lot in good faith, and that they were prevented from continuing them by the unlawful interference of their lessor." Id. at 1019.

There may be legitimate disagreement respecting the precise holding of Justice McCollum's brief Henderson opinion.[11] Even so, the assumption underlying the entire decision is that the quantum or nature of the lessee's preparatory activities do not in themselves matter much to the commencement inquiry. The material issue is, rather, whether the activity – minimal or extensive – is undertaken "in good faith, and with a determination on [the lessee's] part to prosecute with due diligence the work [the lessee was] authorized by the lease to do." Henderson, 38 A. at 1018. Indeed it is not clear that the court or jury in

---

[11]The "view" of the "learned court below" that the "lessor contest[ed] on . . . appeal" was that "[t]he lessees had a clear right to enter and commence operations upon the lot on the 5th of March, and if they did so in good faith, and with a purpose to continue the work in accordance with the provisions of the lease, the resistance of the lessor to their occupancy of the lot furnished no warrant for a forfeiture of the lease." Henderson, 38 A. at 1018.

Commentators view the case as speaking directly to the issue of the quantum of activity necessary to "commence" operations. See Moses, supra, at 578 ("In Henderson . . . it was held that driving a stake for the well location, marking were [sic] the lumber should go, and hauling in some of the lumber, on the last day of the lease, was sufficient to hold the lease."); Summers Oil and Gas § 15:19 n.1 ("In Henderson . . . where the drill or forfeit development clause of a lease required that the lessee commence a well on or before a certain day, it was held that good faith entry on the land on the last day, location of well and unloading lumber at the site, until the lessor interfered and prevented further action, amounted to the commencement of a well.").

Henderson gave any independent consideration to the issue of the quantum or nature of the lessee's activities apart from their bearing on the question of whether the lessee commenced his work "in good faith" or as a "mere bluff." Id. at 1019.

A lessee's intent undertaking preparations for drilling will often – as in Henderson – be a question for the jury to determine. But for cases such as this one, it seems prudent to adopt a practical rule to the effect that where the lessee has "actually proceeded with the drilling to completion of a well, the intent with which he did the preliminary acts are [sic] unquestionable, and the court may rule as a matter of law that the well was commenced within the time specified by the lease." Summers Oil and Gas § 15:19. See also Moses, supra, at 580 ("If the lessee, or operator, does the preliminary work necessary and incidental to the actual drilling of the well and, thereafter, with no lost motion, proceeds to drill and complete the well, no attack can be made on the actual intent with which such preliminary acts was done; it must be presumed to be bona fide.").

Applying these principles to the undisputed facts of this case, the Court holds that Chief was "[conducting operations] on the Leasehold [i.e. Castrogiovanni Unit] in search of production of oil, gas, or their constituents" at the expiration of the respective primary terms of the leases at issue. It is undisputed that Chief surveyed and staked the Castrogiovanni property on October 23 or 24,

2010 (prior to the expiration of the primary term of any lease) and delivered a

bulldozer there. Plaintiffs assert that Chief was idle for the next three or four days,

but this hardly impugns Chief's good faith when one takes into account its

"behind-the-scenes" work and field surveying over the previous seven months,[12] as

well as its continuous work over the winter months culminating in a well on the

Castrogiovanni property in March 2011. Chief commenced operations in good

faith and with the intention of prosecuting the work diligently as a matter of law.

It should be abundantly clear by now that the Court rejects plaintiffs's

interpretation of the lease. The Roe's "position . . . that only actual drilling,

commenced during the primary term, would have been sufficient to hold the lease

in effect after the expiration of the primary term" (Roe Opp'n Br. at 10) is

supported solely by their "silent intent," see Steuart, 444 A2d at 661 ("the focus of

interpretation is upon the terms of the agreement as manifestly expressed, rather

than as, perhaps, silently intended"),  and directly contrary to what caselaw had

firmly established as early as 1942: "One thing is certain – the courts are definite in

_____

[12]Consistent with plaintiffs's construal of the lease, the Court will not
consider Chief's "behind-the-scenes" and pre-unitization work "operations . . .
conducted on the Leasehold." But Chief's "behind-the-scenes" and pre-unitization
work are certainly relevant to any determination of Chief's good faith, and the
Court mentions them here to reinforce that no reasonable jury could conclude that
Chief did not commence operations in good faith.

their holding that the clause does not mean actual drilling of the well by the penetration of drill or bit into the ground." Moses, supra, at 584. Michael and Lori Beinlich's "position that at least some dirt has to be moved around and a site has to be prepared for the imminent drilling of the well" (M. & L. Beinlich Opp'n Br. at 16) appears to be just that – a position developed for purposes of litigation.[13] The Court cannot give effect to the Beinlich's "post hoc judgment . . . as to what should have been" in the guise of contract interpretation. Id. at 663.

In sum, Chief's motion for summary judgment is granted to the extent that plaintiffs's claims rely on the argument that Chief forfeited its leases for failure to conduct operations prior to the expiration of the respective primary terms. That is to say, summary judgment is granted against the Roes and David and Karen Beinlich on all claims,[14] and partially against Michael and Lori Beinlich.

**(b.)    Bad Faith Pooling**

Michael and Lori Beinlich oppose Chief's motion for summary judgment largely on the basis that Chief acted improperly and in bad faith when it included

---

[13]David and Karen Beinlich take seemingly take no position on the meaning of the clause at issue, other than to argue that it is ambiguous.

[14]The Roes and David and Karen Beinlich included allegations of "bad faith pooling" in their complaints, but opposed Chief's motion for summary judgment solely on the bases rejected above. Their papers make no suggestion that there is a genuine issue of material fact with respect to their "bad faith pooling" claims.

their property in the Castrogiovanni Unit. Unfortunately, the Beinlichs fail to support their factual allegations with any law on "bad faith pooling" that would give their assertions legal significance. Chief, in turn, offers a mere footnote, likewise sans law, that does not convince the Court that genuine issues of material fact are necessarily absent. The Court believes the parties have better contributions to offer. Chief's motion for summary judgment is thus provisionally denied, but the Court's Order provides that Chief and, in turn, Michael and Lori Beinlich shall submit supplemental briefing to assist the Court in resolving the issue of alleged "bad faith pooling."

## IV.    Conclusion

For the foregoing reasons, the Chief defendants's motion for summary judgment is granted in part, and denied in part, in accordance with the accompanying Order of this date.

BY THE COURT:

s/Matthew W. Brann
Matthew W. Brann
United States District Judge